# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| TIKTOK INC., | ) |
| | ) |
| and | ) |
| | ) |
| BYTEDANCE LTD., | ) |
| | ) |
| *Petitioners,* | ) |
| | ) |
| v. | ) |
| | ) |
| THE COMMITTEE ON FOREIGN | ) |
| INVESTMENT IN THE UNITED STATES, | ) |
| | ) |
| STEVEN T. MNUCHIN, in his official | ) |
| capacity as Secretary of the Treasury and | ) |
| Chairperson of the Committee on Foreign | ) |
| Investment in the United States, | ) |
| | ) |
| DONALD J. TRUMP, in his official | ) |
| capacity as President of the United States, | ) |
| | ) |
| and | ) |
| | ) |
| WILLIAM P. BARR, in his official capacity | ) |
| as United States Attorney General, | ) |
| | ) |
| *Respondents.* | ) |

No. _____20-1444_____

# PETITION FOR REVIEW

Pursuant to Section 721 of the Defense Production Act (50 U.S.C.

§ 4565(e)(2)) and Rule 15(a) of the Federal Rules of Appellate Procedure,

TikTok Inc. and ByteDance Ltd. hereby petition this Court for review of the Presidential Order Regarding the Acquisition of Musical.ly by ByteDance Ltd., 85 Fed. Reg. 51,297 (Aug. 14, 2020) (the "Divestment Order"), and the related action of the Committee on Foreign Investment in the United States ("CFIUS"), including its determination to reject mitigation, truncate its review and investigation, and refer the matter to the President (collectively, the "CFIUS Action").[1] This Court has original and exclusive jurisdiction to hear Petitioners' challenges. 50 U.S.C. § 4565(e)(2); *see also Ralls Corp. v. CFIUS*, 758 F.3d 296, 311 (D.C. Cir. 2014); *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327–28 (D.C. Cir. 1996).

The Divestment Order and the CFIUS Action seek to compel the wholesale divestment of TikTok, a multi-billion-dollar business built on technology developed by Petitioner ByteDance Ltd. ("ByteDance"), based on the government's purported national security review of a three-year-old transaction that involved a *different business*. This attempted taking

---

[1] A copy of the Divestment Order and CFIUS's July 30, 2020 letter to Petitioners memorializing the CFIUS Action are attached to this Petition.

exceeds the authority granted to Respondents under Section 721, which authorizes CFIUS to review and the President to, at most, prohibit a specified "covered transaction" to address risks to national security created by that transaction. Here, that covered transaction was ByteDance's acquisition of the U.S. business of another Chinese-headquartered company, Musical.ly—a transaction that did *not* include the core technology or other aspects of the TikTok business that have made it successful and yet which the Divestment Order now seeks to compel ByteDance to divest.

The Divestment Order and CFIUS Action are also unlawful in other respects. They violated the Due Process Clause because they prematurely terminated the review to which Petitioners were entitled and denied them a meaningful hearing. The CFIUS Action violated the Administrative Procedure Act because the agency failed to adequately explain its decision and did not take account of the alternative mitigation proposals submitted by Petitioners. Finally, the forced divestment of Petitioners' business without fair compensation would constitute an unlawful taking under the Fifth Amendment.

To facilitate this Court's consideration of this Petition for Review, Petitioners summarize the pertinent factual background and the legal claims they intend to raise.[2]

## Background and Nature of Proceedings

**A.    CFIUS's Authority Over Certain "Covered Transactions"**

1.    CFIUS is an interagency committee authorized under Section 721 to "review" and "investigat[e]" a "covered transaction" to determine its effects on national security.[3]  50 U.S.C. § 4565(b)(1)(A)–(B).  Congress defined a "covered transaction" to include "[a]ny merger, acquisition, or

---

[2] Because Congress established the original and exclusive jurisdiction of this Court over CFIUS petitions for review recently, in 2018, Pub. L. No. 115-232, sec. 1715(2), 132 Stat. 1636, 2191, (50 U.S.C. § 4565(e)(2)), Petitioners are filing a Petition for Review that is more detailed than may be required by Federal Rule of Appellate Procedure 15(a) to provide background on the statutory and regulatory scheme and factual allegations.  *See Am. Paper Inst. v. ICC*, 607 F.2d 1011, 1012 (D.C. Cir. 1979) (per curiam).  Petitioners reserve their rights to raise additional facts and arguments in the briefing on the merits.  *See, e.g.*, *CropLife Am. v. EPA*, No. 02-1057, 2002 WL 1461788, at *1 (D.C. Cir. July 8, 2002) (per curiam).

[3] Section 721 was enacted in 1988, Pub. L. 100-418, and amended several times, most notably in the Foreign Investment and National Security Act of 2007, Pub. L. 110-49, and the Foreign Investment Risk Review Modernization Act of 2018, Pub. L. 115-232.

takeover … by or with any foreign person that could result in foreign control of any United States business." *Id.* § 4565(a)(4)(B)(i).

2. Entities can voluntarily submit such transactions for review, *id.* § 4565(b)(1)(A), and CFIUS can request that parties submit transactions for review, 31 C.F.R. § 800.501(b). CFIUS's review process begins once it accepts a notice of a transaction filed by an entity, *id.* §§ 800.501, 800.503(a), and must be completed within 45 days, 50 U.S.C. § 4565(b)(1)(F); 31 C.F.R. § 800.503(b). The statute provides that CFIUS "shall" conduct an investigation if, *inter alia*, the initial review "results in a determination that – the transaction threatens to impair the national security" and the risk has not been mitigated, to be completed within 45 days from the date the investigation is commenced. 50 U.S.C. § 4565(b)(2)(A), (B)(i)(I), (C)(i); 31 C.F.R. §§ 800.505(a), 800.508(a). CFIUS may, during the review or investigation, "complete the action of the Committee with respect to the transaction" and "refer the transaction to the President for action." 50 U.S.C. § 4565(*l*)(2).

3. Before action by CFIUS is completed or action by the President is taken, CFIUS may "negotiate, enter into or impose, and enforce any agreement or condition with any party to a completed covered

transaction in order to mitigate any risk to the national security of the United States that arises as a result of the covered transaction." *Id.* § 4565(*l*)(3)(A)(i). Such actions "shall be based on a risk-based analysis, conducted by the Committee, of the effects on the national security of the United States of the covered transaction, which shall include an assessment of the threat, vulnerabilities, and consequences to national security related to the transaction." *Id.* § 4565(*l*)(4)(A).

4.     Congress authorized the President "to suspend or prohibit any covered transaction" if the President finds that (i) there is credible evidence that the foreign person acquiring the interest in the U.S. business as a result of the covered transaction might take action that threatens to impair the national security and (ii) provisions of law other than Section 721 and the International Emergency Economic Powers Act do not provide adequate and appropriate authority to protect the national security of the United States in the matter before the President. *Id.* § 4565(d)(1), (4); 31 C.F.R. § 800.101.

**B.     ByteDance's Business**

5.     ByteDance Ltd. ("ByteDance") is an innovative technology company founded as a start-up in 2012 by Chinese entrepreneur Yiming

Zhang. The company launched its first flagship app, Toutiao, the same year. Toutiao is a news and content aggregating app, developed for the Chinese market, that uses a proprietary "recommendation engine" developed entirely in China by ByteDance's team of elite engineers with advanced training and expertise—and based upon cutting-edge machine learning and artificial intelligence technology—to create a personalized content feed for each user.

6.     Based in large part on the innovation and commercial appeal of ByteDance's recommendation engine, Toutiao was a huge success. Toutiao's recommendation engine has influenced the core technology developed for several of ByteDance's other apps. Building on the experience with Toutiao and its recommendation engine, in September 2016, ByteDance launched in China a short entertainment video app called Douyin, and ByteDance created another recommendation engine for Douyin that recommends videos to Douyin users. Like Toutiao, Douyin was highly successful in China.

7.     On May 12, 2017, ByteDance launched TikTok globally in over 150 countries, including the United States. ByteDance developed TikTok to be a short entertainment video app that serves a user base

outside of China. When it launched TikTok, ByteDance leveraged its experience with Toutiao and Douyin, and it developed another recommendation engine that customizes each user's content feed based on how the user interacts with the content they watch. TikTok is operated separately from Douyin (and other ByteDance apps), and at no time has TikTok been available in mainland China.

## C. ByteDance's Acquisition of Musical.ly

8. Another app already in the marketplace at the time of TikTok's launch was Musical.ly, a music video app launched in 2014 and developed by musical.ly (a Cayman parent company, together with its subsidiaries, referred to herein as the "Musical.ly company"). The Musical.ly company was founded by two Chinese entrepreneurs, headquartered in Shanghai, managed from China, and majority owned and controlled by Chinese shareholders.

9. On November 23, 2017, ByteDance acquired the Musical.ly company, which also had a small U.S. presence. Out of nearly 300 Musical.ly company employees worldwide, 20 were based in the United States, and they were not responsible for core operations, such as software and product development. The Musical.ly app had

approximately 9.9 million U.S. registered monthly active users whose data was stored in Japan. After completing the transaction, ByteDance integrated some of the Musical.ly company's U.S. assets—namely, the Musical.ly app's U.S. user base, some music licensing agreements and other copyright agreements—into its TikTok business.

10. At the time of the acquisition, ByteDance examined the Musical.ly app's source code and determined that Musical.ly's platform—the mobile software application, server and data storage infrastructure, and its algorithm powering recommendations for user content—was technically and commercially inferior to TikTok. ByteDance had significantly better engineering infrastructure than Musical.ly, with a more experienced engineering team that was ten times larger. The ByteDance development and engineering teams determined that, although Musical.ly's app was superficially similar to TikTok, the technology developed by ByteDance, and particularly TikTok's recommendation engine, was much more sophisticated.

11. As a result, starting in February 2018, ByteDance abandoned the Musical.ly code base and technology, including Musical.ly's recommendation engine, operation system, user growth, and marketing

tools.  ByteDance kept, for a time, the Musical.ly name, but over the course of 2018, it phased out Musical.ly's back-end operations and technology and combined its user base with the users of the app that ByteDance had started, namely, TikTok.  In August 2018, ByteDance stopped offering the Musical.ly app.

12.    In short, the TikTok technology platform—which is among the most important drivers of its astounding growth and popularity—was not acquired by ByteDance from the Musical.ly company but instead developed by ByteDance before the Musical.ly acquisition had even occurred.

13.   In addition to utilizing TikTok's superior technology, including its recommendation engine, ByteDance significantly increased brand and content promotional spending compared to that of the Musical.ly company.  ByteDance expanded promotions and marketing activities in the United States to include out-of-home advertising, television commercials, and key opinion leader marketing as well as campaigns related to specific events and holidays.   Whereas the Musical.ly company had spent only about $300,000 on advertising in the United States in 2017 before it was acquired by ByteDance in November

of that year, Petitioners spent more than $300 million on U.S. advertising for TikTok in 2019, the first full year after the Musical.ly app was abandoned.

14.    ByteDance also supported TikTok by dramatically expanding its U.S.-based business.  Whereas prior to the acquisition the Musical.ly company had just 20 U.S. employees, Petitioners hired hundreds of U.S. employees led by a U.S.-based leadership team deeply committed to protecting U.S. user data privacy and security, and to promoting U.S.-led content moderation and localized community guidelines.

15.    The improved technological infrastructure and ByteDance's superior commercial strategy bore fruit and significantly increased TikTok's U.S. user base independently of what ByteDance acquired as part of the Musical.ly company.  Although the Musical.ly app had 9.9 million monthly active U.S. users at the time of the transaction in November 2017, today there are 98 million monthly active U.S. users on the TikTok platform, making TikTok the fastest growing app in the country during that period.

**D.    The CFIUS Proceeding**

16.    The parties did not submit the Musical.ly transaction to CFIUS for review in 2017 because ByteDance was a Chinese-headquartered company and Musical.ly was also a Chinese-headquartered company; the Musical.ly company had only a small U.S. presence; and the product was a short form music video app that did not appear to raise any U.S. national security concerns.  Nevertheless, on October 15, 2019, CFIUS sent ByteDance a set of questions regarding its acquisition of Musical.ly.  After several months of responding to CFIUS's questions and making presentations to CFIUS, on May 27, 2020, at CFIUS's request, ByteDance submitted a formal notice to CFIUS regarding its acquisition of the U.S. business of Musical.ly.

17.    On June 15, 2020, CFIUS informed ByteDance by letter that on June 16, 2020, it would initiate its formal review of a covered transaction—ByteDance's acquisition of the "U.S. Business of Musical.ly"—triggering a 45-day statutory-review period.  50 U.S.C. § 4565(b)(1)(F); 31 C.F.R. § 800.503(b).  Over the next several weeks, ByteDance submitted extensive responses to hundreds of questions posed by CFIUS.

18.    Around July 7, 2020, however—only three weeks into the 45-day review process—the government abruptly cut short that process and threatened to force the divestiture of TikTok.  In the preceding weeks, news media had reported that TikTok users claimed to have used TikTok to coordinate mass ticket reservations for the President's June 20, 2020 campaign rally in Tulsa, depressing attendance and causing an embarrassment for the campaign.  Shortly thereafter, on July 6, 2020, Secretary of State Mike Pompeo said that the United States was considering banning TikTok.  Within days of Secretary Pompeo's statement, Treasury Department officials informed ByteDance that it would need to propose a divestiture of TikTok to resolve the matter.

19.    Even though the Treasury Department's demand lacked any legal foundation, ByteDance submitted a term sheet on July 15 that proposed a national security mitigation solution in an effort to address its concerns.  ByteDance submitted another such proposal on July 29, and on July 30, the day before the 45-day statutory review period ended, submitted with Microsoft Corporation a letter of intent regarding a potential transaction involving TikTok.

20. As noted above, if CFIUS identifies a national security concern with the covered transaction during the initial 45-day statutory review period, the statute and regulation contemplate that CFIUS "shall" conduct an investigation that may last for an additional 45 days, 50 U.S.C. § 4565(b)(2)(A), (B)(i)(I), (C)(i); 31 C.F.R. § 800.505(a), 800.508(a), which period gives CFIUS the opportunity to investigate the facts thoroughly and, if CFIUS has concerns about the transaction, engage in detailed consultations regarding potential mitigation of its concerns with the entities involved in the transaction. After its investigation, if CFIUS rejects mitigation, CFIUS sends a letter to the entity, as required by this Court's decision in *Ralls*, 758 F.3d at 319 (addressing the predecessor statutory CFIUS scheme), detailing the unclassified basis of its findings and affording the entity the opportunity to respond before determining whether to issue a report to the President.

21. In this case, CFIUS dramatically departed from this statutory and regulatory scheme and well-established agency practice. Instead of the deliberative process required by Section 721, Treasury officials summarily conveyed to Petitioners CFIUS's intent to force a divestment even though the Committee's staff was continuing to gather facts to

inform its statutorily required risk-based analysis. CFIUS itself never responded to Petitioners' proposed mitigation solutions and never explained why these mitigation solutions were inadequate, nor did it offer any counter-proposals for mitigation.

22. On July 30, 2020, at the end of the 45-day review period, CFIUS notified Petitioners by letter that CFIUS was "undertaking an investigation of the transaction," commencing the 45-day statutory investigation period. Just a few hours later, however, CFIUS informed ByteDance in a separate letter that it had rejected ByteDance's mitigation proposals and had not identified adequate mitigation measures, without any explanation of the basis for that determination. The letter stated summarily that ByteDance's two mitigation proposals "do not adequately address" the Committee's concerns. The letter also stated that CFIUS "anticipate[d]" that it would "refer the matter to the President for decision." CFIUS then—the very next day—referred the matter to the President without affording ByteDance a meaningful opportunity to respond to CFIUS's determination to reject mitigation and instead refer the matter to the President. This summary determination rejecting mitigation, truncating CFIUS's review and investigation, and

referring the matter to the President (collectively, the "CFIUS Action") "complete[d]" CFIUS's action with respect to the transaction, 50 U.S.C. § 4565(*l*)(2).

23.  On August 7, 2020, ByteDance responded to the July 30 CFIUS letter, demonstrating that many of the factual findings in the letter were inaccurate or outdated and reiterating its request for prompt and meaningful engagement with CFIUS.  To date, ByteDance has not received a substantive response to its August 7 letter.

### E.    The Divestment Order

24.  On August 14, 2020, the President issued the Divestment Order.  The Order asserted, again without explanation, that ByteDance, through its acquisition of Musical.ly, "might take action that threatens to impair the national security of the United States."  The Divestment Order prohibited ByteDance's acquisition of the Musical.ly company and directed ByteDance to "divest all interests and rights in (i) any tangible or intangible property, wherever located, used to enable or support ByteDance's operation of the TikTok application in the United States … [and] (ii) any data obtained or derived from TikTok application or Musical.ly application users in the United States."  The Divestment

Order states that it takes effect on November 12, 2020, unless CFIUS grants a 30-day extension.

25.    Before the issuance of the Divestment Order, President Trump stated that he might be willing to approve a mitigation proposal involving a transaction with a U.S. acquirer *in lieu* of a ban, so long as the government would receive a "substantial portion" of any price paid by the acquirer.

26.    While Petitioners believed the Divestment Order to be unlawful, they continued to explore mitigation alternatives with the government to try to achieve a resolution that would obviate the need for litigation.  To that end, on September 13, Petitioners proposed a multi-layered approach to security of the TikTok app and its U.S. user data to fully address any national security concerns.

27.    On September 19, 2020, the President informed reporters that he had given his "blessing" to and "approved … in concept" that September 13 mitigation proposal.[4]  The President also indicated that the

---

[4] Rachel Lerman, "Trump says he has given his 'blessing' to TikTok deal but that final terms are still being negotiated," *Washington Post* (Sep. 19, 2020).

agreement involved "about a $5 billion contribution toward education," but did not specify the source of the investment or the purpose for which it would be used.[5] During a campaign rally that evening, the President announced what he alleged to be a new term of the proposed TikTok agreement. Specifically, he stated that the U.S. government had a "deal worked out," in which the parties to the deal would "pay $5 billion into a fund for education" so that "we can educate people as to the real history of our country."[6] Petitioners had not agreed to contribute to such a fund.

28. On November 6, 2020, ByteDance submitted a fourth mitigation proposal, which contemplated addressing the purported national security concerns through a restructuring of TikTok U.S. by creating a new entity, wholly owned by Oracle, Walmart and existing U.S. investors in ByteDance, that would be responsible for handling TikTok's U.S. user data and content moderation. To allow time to negotiate the final terms of a mitigation solution, ByteDance requested that CFIUS extend by 30 days the deadline for complying with the

---

[5] *Id.*

[6] Demetri Sevastopulo & James Fontanella-Khan, "Doubts surround 'education fund' at heart of US TikTok deal," *Financial Times* (Sept. 20, 2020).

Divestment Order, which the Order itself authorized. As of this filing, no extension has been granted.

29. From the time the Divestment Order was issued, Petitioners have been engaged in discussions with CFIUS in an effort to reach a mitigation solution that would avoid litigation. Petitioners had hoped it would not be necessary to seek judicial intervention, but given that the Divestment Order mandates divestment by November 12, Petitioners have no choice but to file this Petition to preserve their rights. Petitioners remain committed to reaching a negotiated mitigation solution with CFIUS satisfying its national security concerns, and they intend to file a motion to stay enforcement of the Divestment Order only if discussions reach an impasse and the government indicates an intent to take action to enforce the Order.

## Grounds On Which Relief Is Sought

Petitioners seek review of the CFIUS Action and Divestment Order on grounds that include, without limitation, the following.

## Ground 1: *Ultra Vires* Action

30. The CFIUS Action and the Divestment Order exceed the scope of the government's authority under Section 721 of the Defense

Production Act and are *ultra vires*, because they (i) seek to compel divestment of assets that were not part of, and (ii) seek to address purported national security risks that do not arise out of, the "covered transaction." *See* 50 U.S.C. § 4565(d)(1) (limiting Presidential action to covered transactions and risks threatened from such transactions); *id.* § 4565(b)(1), (2) (limiting CFIUS "national security reviews and investigations" to covered transactions).

31.    The CFIUS Action and Divestment Order are *ultra vires* because they seek to compel the divestment of assets that were not part of the covered transaction.  Congress in Section 721 authorized CFIUS to review and investigate only a "*covered transaction* to determine the effects of the transaction" on national security.   50 U.S.C. § 4565(b)(1)(A)(i), *see also id.* § 4565(b)(2) (authorizing "investigation of the effects of a *covered transaction* on the national security").  During its "review or investigation of a *covered transaction*," CFIUS may "complete the action of the Committee with respect to the transaction and refer *the transaction*" to the President for action or impose conditions on "the *covered transaction* in order to mitigate any risk to the national security of the United States that arises as a result of the covered transaction."

*Id.* § 4565(*l*)(2), (3)(A)(i).  The President, in turn, has authority to, at most, "suspend or prohibit any *covered transaction* that threatens to impair the national security of the United States."  *Id.* § 4565(d)(1).

32.    The plain text of Section 721 thus limits the authority of CFIUS and the President to the covered transaction: CFIUS may refer only a "covered transaction" to the President, and the President may suspend or prohibit only a "covered transaction."

33.    Yet the CFIUS Action and Divestment Order ignore that limitation.

      a. The CFIUS Action—the determination that national security risk arising from the transaction could not be mitigated and the referral to the President—exceeded this statutory authority because it was directed at the TikTok U.S. business in its entirety, even though the "covered transaction" under review was ByteDance's acquisition of the U.S. business of the Musical.ly company.

      b. The Divestment Order exceeded statutory authority because it mandated that ByteDance divest the entire U.S. TikTok business and all data and assets associated with it, and thus

was not limited to the U.S. business of the Musical.ly company that was the covered transaction.

c. The Musical.ly brand has been completely phased out of Petitioners' TikTok U.S. business for more than two years, and only 3.2 million of TikTok's 98 million monthly active U.S. users had a Musical.ly app account at the time of the transaction. The TikTok U.S. business—its technology, its value, its employees, locations, contracts, and the overwhelming majority of its users and their data—is a product of ByteDance that was not derived from the U.S. business of Musical.ly, and thus was not part of the "covered transaction," and the President accordingly did not have the authority to order its divestment.

d. The CFIUS Action and the Divestment Order ignored these facts, all of which Petitioners provided to CFIUS during its months-long gathering of information. The CFIUS Action targeted TikTok and its "approximately 133 million users" even though neither TikTok nor the vast majority of its users were acquired by ByteDance as part of the Musical.ly

company transaction. The Divestment Order similarly purports to require ByteDance to divest "any tangible and intangible assets or property, wherever located, used to enable or support ByteDance's operation of the TikTok application in the United States" and "any data obtained or derived from TikTok application or Musical.ly application users in the United States"—in other words, assets that had nothing to do with ByteDance's acquisition of Musical.ly or the U.S. business of Musical.ly or its U.S. assets and, in critical aspects, encompassed assets that are not and never have been in the United States.

e. Neither the CFIUS Action nor the Divestment Order even attempt to justify a divestment of the scope and character demanded. Instead, they merely assert that "ByteDance merged its TikTok application with Musical.ly's social media application and created a single integrated social media application." While Musical.ly's 9.9 million monthly active users migrated to TikTok, and the U.S. Musical.ly entities were renamed to reflect that the Musical.ly app and brand

had been abandoned, the CFIUS Action and Divestment Order do not explain how this could subject the entire TikTok U.S. business to divestment under CFIUS authority, including the technology used to support and the data derived from that business—which indisputably was not part of the covered transaction.

34. The CFIUS Action and Divestment Order are *ultra vires* for the additional reason that they seek to address purported national security risks that do not arise out of the "covered transaction." Section 721 limits CFIUS's authority to the review and investigation of "the *effects of a covered transaction* on the national security of the United States." 50 U.S.C. § 4565(b)(1)(A)(i), (2)(A) (emphasis added). Before completion of CFIUS's review or investigation, it may "mitigate any risk to the national security of the United States that arises *as a result* of the covered transaction." *Id.* § 4565(*l*)(3)(A)(i) (emphasis added). And CFIUS may make a referral to the President based only on "a risk-based analysis … of the effects on the national security of the United States *of the covered transaction*." *Id.* § 4565(*l*)(4)(A) (emphasis added).

35.     CFIUS's regulations, in turn, provide that such a "risk based analysis shall include credible evidence demonstrating the risk and an assessment of the threat, vulnerabilities, and consequences to national security *related to the transaction*."    31 C.F.R. § 800.102 (emphasis added).  The President may act only "to suspend or prohibit any *covered transaction that threatens to impair* the national security of the United States."    50 U.S.C. § 4565(d)(1) (emphasis added).    To mandate divestment, the President must find that the foreign acquirer "*as a result of the covered transaction* might take action that threatens to impair the national security."  *Id.* § 4565(d)(4)(A) (emphasis added).

36.     The statute thereby limits CFIUS's and the President's authority to address national security risks arising as a result of the covered transaction.    The statute does not authorize CFIUS or the President to address preexisting national security risks or other national security risks that do not result from the covered transaction.  Yet in this respect as well the CFIUS Action and Divestment Order exceed the limits of the statute.

       a. The CFIUS Action and the Divestment Order exceed Section 721's grant of authority because the purported risks they

address do not arise "as a result of" the acquisition, which was an acquisition of one China-headquartered company (Musical.ly) by another China-headquartered company (ByteDance). Rather, the risks cited by the government are associated with concerns relating to Chinese ownership of apps *generally*. Any threat posed by Chinese ownership of the Musical.ly app was present prior to the covered transaction, and is not a risk that arose as a result of the covered transaction. It is necessarily the case that whatever national security risks posed by the Musical.ly app and its Chinese ownership at the time of the acquisition were not enlarged or changed by the acquisition of the Musical.ly company by another China-headquartered company, ByteDance.

b. CFIUS did not explain how the covered transaction—the acquisition of one China-headquartered company of another—results in an incremental national security risk. Nor does the Divestment Order, which is even more sparse and merely parrots the statutory language, declaring that ByteDance, through the transaction, "might take action that

threatens to impair the national security of the United States."

    c. Because the CFIUS Action and Divestment Order are predicated on perceived threats that are not a result of the covered transaction, they are unlawful. *Cf.* Dep't of Defense Instr. No. 2000.25, DoD Procedures for Reviewing and Monitoring Transactions Filed with the Committee on Foreign Investment in the United States (CFIUS) at 32 ("If the only risk that exists after the transaction is the same risk that existed before the transaction, then that risk is not considered an appropriate rationale for CFIUS-based mitigation.").

## Ground 2: Violation of Due Process

37. CFIUS's rejection of mitigation, truncation of its review and investigation, and referral of the matter to the President, and the manner in which the Divestment Order was issued, violated Petitioners' Fifth Amendment due process rights.

38. In a CFIUS proceeding involving divestiture, "due process requires, at the least, that an affected party be informed of the official

action, be given access to the unclassified evidence on which the official actor relied and be afforded an opportunity to rebut that evidence." *Ralls*, 758 F.3d at 307–14, 319. Petitioners here have protected interests in their assets subject to divestment, such that they are entitled to due process under the Fifth Amendment. *Id.* at 315–16.

39. Petitioners were not afforded a meaningful opportunity to review or respond to the facts upon which the CFIUS Action and Divestment Order purported to be based. Although Petitioners were permitted to provide information *to* CFIUS, they were *not* "given access to the unclassified evidence on which the official actor relied" or "afforded an opportunity to rebut that evidence." *Ralls*, 758 F.3d at 319.

40. The July 30 letter announcing the CFIUS action was cursory, conclusory, and unsubstantiated. The letter failed to address key points necessary for ByteDance to understand CFIUS's concerns and have a meaningful opportunity to respond to them. And CFIUS addressed its supposed concerns—the most important issue in a CFIUS review—in a single, conclusory sentence. Beyond this one conclusory sentence, CFIUS's findings in the July 30 letter either were so broad as to apply to every company active in China; were based on inaccurate or outdated

news reports; or were unsupported or, in some cases, directly contradicted by the record before CFIUS. While Treasury officials expressed their intent to conclude that the agency had concerns, CFIUS itself never informed ByteDance of its concerns prior to announcing the CFIUS action on July 30 and did not provide any explanation for its determination that the purported national security risks could not be adequately mitigated other than through complete divestiture. Moreover, CFIUS's determination concluding CFIUS's action was issued only a few hours before the referral to the President, precluding ByteDance from a meaningful opportunity to respond.

### Ground 3: Violation of the Administrative Procedure Act

41.    The CFIUS Action was arbitrary, capricious, and unlawful. *See* 5 U.S.C. § 706(2).

42.    To survive APA scrutiny, "the agency must examine the relevant data and articulate a satisfactory explanation for its action [that is] based on a consideration of the relevant factors ...." *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result."

*Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993).  Moreover, an agency must "consider significant alternatives to the course it ultimately chooses."  *Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000).

43.    The    CFIUS    Action    relied    almost    exclusively    on uncorroborated third-party reports and ignored significant evidence presented by Petitioners that refuted CFIUS's stated concerns.   In particular, the CFIUS Action failed to consider or explain why the steps that ByteDance was willing to undertake to mitigate CFIUS's purported national security concerns were inadequate.   Petitioners submitted two detailed proposed term sheets on July 15 and July 29, 2020.   CFIUS's July 30 letter announcing its action—sent the day after the second term sheet was submitted—stated summarily that CFIUS "considered the feasibility" of the proposals and that the mitigation proposals "do not adequately address" the government's concerns.

44.    The July 30 letter articulates no national security concerns that could not have been resolved by either proposal.   To the contrary, the only justification for CFIUS's conclusion was that "as ByteDance *currently* operates, company leadership and personnel in China remain

significantly involved in both the day-to-day operations and broader strategic direction of TikTok, reducing the likelihood that any U.S.-based personnel could successfully detect, disclose, and defeat actions to impair U.S. national security." The explanation is a non sequitur: ByteDance's mitigation proposals contemplated significant alterations to the current operation of TikTok in the United States, which the government's public statements have indicated could be adequate.

45. In short, CFIUS chose the harshest measure available under the statute—a referral to the President for divestiture—without considering alternatives, trying to craft a narrower solution, or providing a cogent explanation of why divestiture was justified over such alternatives. That failure renders CFIUS's action arbitrary and capricious. Where, as here, interested parties propose an alternative that "was neither frivolous nor out of bounds," it is reversible error for an agency to fail to consider that alternative. *Chamber of Commerce v. SEC*, 412 F.3d 133, 145 (D.C. Cir. 2005).

## Ground 4:  Unconstitutional Taking

46.    The  Presidial  Order  constitutes  an  unlawful  taking without just compensation, in violation of the Fifth Amendment's Taking Clause.

47.    The Order effectively leaves ByteDance no choice but to either (i) forfeit  all  of  its  assets  in  and  data  derived  from  the  TikTok  U.S. business  to  the  government  or  a  government-approved  entity,  on whatever conditions the government decides to impose, or, (ii) if such an agreement cannot be reached, abandon the TikTok U.S. business.

48.    This forced divestiture mandated by the government, which would  permanently  deprive  ByteDance  of  its  property  without compensation, is a classic taking.  The government has taken virtually *all* of the "sticks" in the "bundle" of property rights ByteDance possesses in its TikTok U.S. platform, leaving it with no more than the twig of potentially  being  allowed  to  make  a  rushed,  compelled  sale,  under shifting  and  unrealistic  conditions,  and  subject  to  governmental approval.  *See Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 831 (1987). This "mandate to relinquish specific, identifiable property" thus "effects a per se taking."  *Horne v. Dep't of Agric.*, 576 U.S. 350, 364–65 (2015).

49.    Prospective relief is warranted where, as here, just compensation would not be available if the unlawful order is enforced. *See Eastern Enterprises v. Apfel*, 524 U.S. 498, 521–22 (1998) (plurality op.) (collecting cases involving "the lack of a compensatory remedy" in which the Court has "granted equitable relief for Takings Clause violations" and concluding that "declaratory judgment and injunction sought by petitioner constitute an appropriate remedy under the circumstances"); *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 71 n.15 (1978) (providing declaratory relief on a takings claim because challenged action could produce "potentially uncompensable damages").

50.    This taking cannot be defended as a bona fide exercise of regulatory authority. The factors in *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 123–24 (1978), support the conclusion that the Divestment Order is an unconstitutional taking. The economic impact of the divestment is severe, it profoundly interferes with ByteDance's reasonable investment-backed expectations, and it does not actually further the purported purpose of protecting national security.

## Requested Relief

Petitioners request that this Court hold unlawful, vacate, enjoin, and set aside the Divestment Order and the CFIUS Action, and grant any further relief that may be appropriate.

DATED: November 10, 2020      Respectfully submitted,

*/s/ Beth S. Brinkmann*

| | |
|---|---|
| John E. Hall | Beth S. Brinkmann (No. 477771) |
| Anders Linderot | Alexander A. Berengaut |
| COVINGTON & BURLING LLP | Thomas R. Brugato |
| The New York Times Building | COVINGTON & BURLING LLP |
| 620 Eighth Avenue | One CityCenter |
| New York, New York 10018 | 850 Tenth Street, NW |
| Telephone: +1 (212) 841-1000 | Washington, DC 20001 |
| Facsimile: + 1 (212) 841-1010 | Telephone: +1 (202) 662-6000 |
| Email: jhall@cov.com | Facsimile: + 1 (202) 778-6000 |
|      alinderot@cov.com | Email: bbrinkmann@cov.com |
| |      aberengaut@cov.com |
| |      tbrugato@cov.com |

*Attorneys for Petitioners*

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

| | |
|---|---|
| TIKTOK INC., ) | |
| ) | |
| and ) | |
| ) | |
| BYTEDANCE LTD., ) | |
| ) | |
| *Petitioners,* ) | |
| ) | |
| v. ) | |
| ) | |
| THE COMMITTEE ON FOREIGN ) | |
| INVESTMENT IN THE UNITED STATES, ) | |
| ) No. _____ | |
| STEVEN T. MNUCHIN, in his official ) | |
| capacity as Secretary of the Treasury and ) | |
| Chairperson of the Committee on Foreign ) | |
| Investment in the United States, ) | |
| ) | |
| DONALD J. TRUMP, in his official ) | |
| capacity as President of the United States, ) | |
| ) | |
| and ) | |
| ) | |
| WILLIAM P. BARR, in his official capacity ) | |
| as United States Attorney General, ) | |
| ) | |
| *Respondents.* ) | |

_____

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure

and Circuit Rule 26.1, Petitioners state as follows:

ByteDance Ltd. ("ByteDance") is a private company incorporated in the Cayman Islands. ByteDance owns several content platforms that enable people around the world to connect with, consume, and create entertainment content, including TikTok. TikTok is an inclusive platform for short-form mobile videos with over two billion global downloads and 98 million monthly active users in the United States.

TikTok Inc. is an indirect wholly owned subsidiary of ByteDance. All of the outstanding shares of capital stock of TikTok Inc. are held by TikTok LLC, a Delaware limited liability company, which in turn is wholly owned by TikTok Ltd., a Cayman entity, which in turn is wholly owned by ByteDance.

DATED: November 10, 2020                    Respectfully submitted,

                                            /s/ Beth S. Brinkmann
John E. Hall                                Beth S. Brinkmann (No. 477771)
Anders Linderot                             Alexander A. Berengaut
COVINGTON & BURLING LLP                      Thomas R. Brugato
The New York Times Building                 COVINGTON & BURLING LLP
620 Eighth Avenue                           One CityCenter
New York, New York 10018                    850 Tenth Street, NW
Telephone: +1 (212) 841-1000                Washington, DC 20001
Facsimile: + 1 (212) 841-1010               Telephone: +1 (202) 662-6000
Email:  jhall@cov.com                       Facsimile: + 1 (202) 778-6000
        alinderot@cov.com                   Email:  bbrinkmann@cov.com
                                                    aberengaut@cov.com
                                                    tbrugato@cov.com

                                            *Attorneys for Petitioners*

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th Day of November, I caused copies of the foregoing Petition for Review and Corporate Disclosure Statement to be served upon the parties listed below by first class mail, postage prepaid, to:

Committee on Foreign Investment in the United States
U.S. Department of the Treasury
1500 Pennsylvania Ave. NW
Washington, DC 20220

Steven T. Mnuchin
Secretary of the Treasury of the United States
U.S. Department of the Treasury
1500 Pennsylvania Ave. NW
Washington, DC 20220

Donald J. Trump
President of the United States
The White House
1600 Pennsylvania Ave. NW
Washington, DC 20500

William P. Barr
United States Attorney General
950 Pennsylvania Ave. NW
Washington, DC 20530

*/s/ Beth S. Brinkmann*
Beth S. Brinkmann